IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES P. RAY,<br><br>               Petitioner,<br><br>       vs.<br><br>STU SHERMAN, Warden,<br>California Substance Abuse Treatment<br>Facility and State Prison,[1]<br><br>               Respondent. | No. 2:13-cv-02220-JKS<br><br>MEMORANDUM DECISION |

James P. Ray, a state prisoner proceeding *pro se*, filed a Petition for Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Ray is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the California Substance Abuse Treatment Facility and State Prison in Corcoran, California. Respondent has answered, and Ray has replied. This Court recently denied the petitions for habeas relief filed by Ray's co-defendants, Paula R. Moyer and Christopher Morgan, in *Moyer v. Johnson*, No. 2:12-cv-01170-JKS, and *Morgan v. Lackner*, No. 2:12-cv-02269-JKS. Ray's Petition raises many of the same issues raised in Moyer's and Morgan's cases.

I. BACKGROUND/PRIOR PROCEEDINGS

On September 11, 2007, Ray and his co-defendants, Moyer and Morgan, were charged with murder in connection with the May 5, 2006, robbery and subsequent death of a 78-year-old man. The information also alleged robbery and burglary special circumstances.

---

[1]     Stu Sherman is substituted for Ralph Diaz as Warden, California Substance Abuse Treatment Facility and State Prison. FED. R. CIV. P. 25(d).

On direct appeal of his conviction, the California Court of Appeal recounted the

following facts underlying the case against Ray:

> Farhan Jweinat lived in the Vacaville home of his son Suleiman[2] and his family. Farhan was in good health for his age, although he suffered from coronary artery disease and had stents in two arteries. On the afternoon of May 5, 2006, while other members of the Jweinat family were not at home, neighbors discovered Farhan standing in the front yard, covered in blood with his hands tied behind his back. Farhan said in broken English, "[T]hey won't stop hitting me, they won't stop hurting me, they just keep hitting me over and over." He said they had wanted money and he gave them $700. Farhan was taken to the hospital for treatment, where he told Detective Carey of the Vacaville Police Department that his attackers were two "American" men in their 30s.

> > FN2. Because this opinion refers to family members who share the same last name, we sometimes refer to them by their first names only. No disrespect is intended.

> Farhan's daughter-in-law Vera Jweinat rushed home after she learned what had happened. She walked through the house with Detective Carey and saw that every room had been ransacked. There was blood on the floor in the kitchen, family room, Farhan's bedroom and an adjacent bathroom. Farhan's bedroom, which was usually spotless, was in disarray, and his dentures were found in a large pool of blood in the kitchen. Vera found a bottle of pepper spray on her bedroom dresser that did not belong to her, and Detective Carey smelled pepper spray and noticed a liquid that appeared to be pepper spray on the kitchen floor. Vera discovered that gold jewelry worth between $50,000 and $70,000 was missing, as was a computer, a Gameboy, her son's tennis shoes and various household decorations. One of the neighbors had seen a blue car parked in the Jweinats' driveway and had noticed a woman with long black hair and a red sweater near the car.
> Appellant Moyer, who has long black hair, had recently worked as a housekeeper for the Jweinats. Farhan had been home when Moyer came to clean, although the two did not have much interaction because Farhan's English was limited. In March 2006, Vera Jweinat had discovered that about $60,000 to $70,000 in casino winnings was missing from its hiding place in her master bedroom, and she suspected Moyer of taking it. She reported the theft to police, but then asked them to stop the investigation because her daughter was afraid. Vera had asked Moyer to return for one final cleaning job, intending to confront her, but when Moyer came over, Vera changed her mind and decided not to raise the subject.
> After reviewing the police report regarding the March 2006 theft, Detective Carey decided to contact Moyer about the current burglary and assault on Farhan. Carey went with other officers to Moyer's house in Woodland at about 11:45 p.m. on May 5, 2006, the same day as the burglary and assault. They found a black ring on the counter next to Moyers's purse and a bracelet inside the purse, both of which were later identified by Vera Jweinat as belonging to her. The purse also contained a receipt from a McDonald's

located about half a mile from the Jweinats' home, which was generated on May 5, 2006, at 12:33 p.m.  Moyer's boyfriend Paul Hinojosa was present and his black Acura was parked in the driveway.  The car was impounded and later searched, during which time officers found a red sweatshirt and three rings belonging to Vera Jweinat.

After interviewing Moyer, police went to the home of her next door neighbors, appellant James Ray and his girlfriend Karly Harrison.  Ray was discovered hiding under the bed with a gun holster underneath him, and a handgun was found under the mattress.  He was carrying a wallet with over $400 in cash, and another $200 in cash was inside the pocket of a pair of shorts found in the bedroom.  Jewelry that was later identified as belonging to Vera Jweinat was found in the bedroom closet, hidden between some pants that were folded on a shelf.  A pair of black pants found in the house ultimately tested positive for Farhan Jweinat's blood.[3]

> FN3. The pants had a size 38 waist. The blue jeans Ray was wearing at the time of his arrest had a size 33 waist.

Meanwhile, Farhan Jweinat remained in the hospital for treatment.  On May 17, 2006, he suffered a cardiac arrest and stopped breathing after receiving surgery for a broken jaw that he suffered during the attack.  He was resuscitated, but remained in a persistent vegetative state and ultimately died on March 19, 2007, about 10 months after the attack.  According to Dr. Arnold Josselson, who performed the autopsy, the cause of death was "anoxic encephalopathy (loss of oxygen to the brain) due to blunt force injuries."

Although she initially lied to the police to protect Ray (who wrote her love letters while they were both in jail), Karly Harrison ultimately became the principal witness for the prosecution and was allowed to plead guilty to first degree burglary with a maximum sentence of four years in exchange for her truthful testimony at appellants' trial.  She testified to the following events surrounding the burglary of the Jweinat home:

Harrison had met Ray while they were both residents in a drug and alcohol rehabilitation center in 2005.  They moved in next door to Moyer and her boyfriend Hinojosa, with whom they became acquainted.  Moyer bragged to Harrison about taking $74,000 from a house in Vacaville while she was working as a housekeeper, and said she had bought two cars with the money after spending $5,000 on drugs and in casinos.  In March 2006, Moyer told Harrison she had been called to clean the house again and was nervous that it might be a "setup."

Moyer, Ray and Hinojosa discussed burglarizing the Jweinats' house to see whether they had more cash.  Harrison was opposed, because she was worried that Ray would get into trouble and go to prison.  The plan was to commit the burglary on May 4, 2006, but it did not go forward and Hinojosa said he could not do it the following day because he had an appointment he could not miss.  Moyer came to Ray and Harrison later that night and told them that Hinojosa's brother Chris (appellant Christopher Morgan) could stand in for Hinojosa.

Early the next morning, May 5, 2006, Moyer came to the house and gave Harrison a line of methamphetamine.  Moyer also brought over some beanies, walkie

talkies and gloves.  Harrison understood that they were going to burglarize the Jweinats'
house that day, and Ray convinced her to come along so she could make sure he stayed in
the car and did not go inside the house.

Harrison and Ray drove to Vacaville in Ray's car, a teal blue Corsica, and met
Moyer and Morgan at a McDonald's near the Jweinats' home.  Moyer and Morgan were
driving the black Acura owned by Hinojosa.  After having lunch, Moyer told Harrison to
get into the Acura with her, while Ray and Morgan got into the Corsica.  Moyer led the
way to the Jweinats' house, parked on the street and then conferred with Ray and
Morgan. Ray parked the Corsica in the Jweinats' driveway and went toward the house
with Morgan.  Moyer received a call on her cell phone and Harrison heard her tell the
caller to use the back door because it was always open.

As she and Harrison were waiting in the Acura, Moyer changed into a red
sweatshirt.  After about 10 minutes, Moyer told Harrison to drive her to the Jweinats'
house so she could "get them out."  Moyer went inside the house while Harrison drove
back to their original parking place, and about 10 minutes later, Harrison saw Moyer,
Ray and Morgan come out of the house and get into Ray's car.  Harrison met them back
at the McDonald's, where she noticed that Morgan had blood on his clothes.  Moyer and
Morgan drove away in the Acura, while Harrison rode home in the Corsica driven by
Ray.  Ray told her that everything had "got all fucked up," and "the less you know the
better."  He showed her a gun in a holster and told her he got it during the burglary.[4]

> FN4. Although Suleiman and Vera Jweinat told the police they did not have a gun
> in the house, bullets were found in Farhan's room during the investigation of this
> crime.

Later that day, Moyer, Hinojosa and Morgan went to Ray's and Harrison's house
and divided up jewelry, watches, "little bags," shoes, clothing and a computer.  After the
others left, Ray started talking about leaving California and Harrison took him to a motel
in Sacramento.  Ray returned later that night because he did not want to be without
Harrison, and Harrison began packing so they could go to Reno.  At some point she
realized that police were entering Moyer's house.  She told Ray to leave, but he did not
do so and they were both arrested that night.

Another important trial witness was Mariah Alsop, the significant other of
Moyer's mother, Gail Garcia.  Alsop testified at trial that on the day after Moyer's arrest,
she and Garcia went to Moyer's home to remove Moyer's belongings.  While Alsop was
standing outside smoking a cigarette, a man she did not then know, but whom she
identified as appellant Morgan, came up to her and started talking.  He said, "I'm so
scared," and when asked why, said it was "because they're looking for me."  Morgan told
Alsop that they were supposed to steal a car and he was going to drive one of the cars,
then said that he waited at a McDonald's and they were supposed to bring the car to him.
He then changed his story and said that he and Ray went into a house and found an old
man there.  They bound the man and put him in the bathroom, and Morgan told him that
if he kept his mouth shut nothing would happen.  Morgan went upstairs to look for things
to steal and heard Ray yelling, "You better get the f—down here, I just hit this old man."

4

Morgan went downstairs and saw Ray viciously beating the old man, who had blood running down his head.  Morgan told Alsop that he joined Ray in the beating, and then he and Ray left.

Ray testified in his own defense and claimed that he had moved out of the home he shared with Harrison several days before the crime was committed and had not participated at all.  He explained that he was visiting Harrison on the night of their arrest because they needed to discuss their relationship.  Ray's friend John Lee and other members of Lee's family testified that Ray was at their home in Sacramento during the day on May 5, 2006, a fact they remembered because of the Cinco de Mayo holiday.

Ray also called Detective Carey as a witness, who testified that a man named Jason Stevens had been discovered with jewelry taken from the Jweinats' house.  Carey did not consider him a suspect in the case and had not tried to verify his whereabouts on May 5, 2006.  Other individuals in the Woodland and Davis areas were also caught with jewelry that had been taken from the Jweinats' house.

In addition to Ray's alibi/third party culpability defense, appellants attempted to show that they were not liable for felony murder or the special circumstances because the injuries Farhan suffered during the robbery and burglary did not cause his death.  The medical evidence was as follows:

Farhan was initially admitted to North Bay Medical Center on the day of the attack, and was then airlifted to U.C. Davis Medical Center for treatment, where he was admitted in critical condition.  His jaw was broken, but the necessary surgery was delayed to allow the blood thinners that he was taking for his heart condition to leave his system. Farhan had difficulty breathing and was placed on a ventilator several times during his stay, and a tracheostomy tube was placed in his neck to allow him to breathe more easily. Surgery was performed on his broken jaw on May 12, 2006 (a week after the attack), and he remained in critical condition in the intensive care unit until May 16, 2006, when he was moved to a regular hospital ward.  On May 17 he had a cardiac arrest and stopped breathing, which deprived his brain of oxygen.  It was impossible to determine which occurred first—the cessation of breathing or the cardiac arrest.  Although Farhan was resuscitated, he remained in a persistent vegetative state until he died 10 months later, on March 19, 2007.

Dr. Josselson, a forensic pathologist who testified as the prosecution's expert, testified that it was not possible to determine exactly what caused Farhan's heart to stop. The medical records noted that a mucous plug may have developed in his tracheostomy tube, thus blocking the flow of oxygen and causing a cardiac arrest due to the loss of oxygen.  Though Farhan had been checked shortly before the episode, a mucous plug could have developed suddenly.  Dr. Josselson also believed that the various stresses to Farhan—the recent attack, his stay at the hospital, the use of a breathing tube, his inability to readily communicate with hospital staff in English, all on top of a heart weakened by coronary disease—could have caused him to suffer cardiac arrest.  The medical notes from Farhan's records showed that his blood pressure was elevated after the surgery, and that the doctors were trying to control his pain, another source of stress. Farhan had undergone a procedure on May 9, 2006 (a few days before his jaw surgery) to

5

insert a filter into his vena cava so a blood clot developing in his leg would not go into
his heart.

> Farhan was not on a heart monitor at the time of his cardiac arrest, so there was
no electrocardiogram (EKG) to indicate a problem immediately before the event.  Dr.
Josselson thought that both stress and a mucous plug contributed to the cardiac arrest, but
either factor alone could have been the cause.  Dr. Josselson believed that the assault
during the burglary led to a chain of events causing cardiac arrest and that as a result of
the cardiac arrest, Farhan went into a vegetative state and died.

> The defense presented the expert testimony of Dr. Coleman Ryan, a cardiologist.
According to Dr. Ryan, Farhan had suffered from coronary artery disease but had been
doing well for several days before and after the jaw surgery on May 12, 2006.  He was no
longer on a ventilator, his oxygen readings were good and his treating physicians had
declared him stable.  Dr. Ryan characterized the cause of death as a "mystery."  It was
unlikely that stress caused cardiac arrest, as stress is more likely to cause heart
arrhythmia and there was no evidence of arrhythmia.  Dr. Ryan did not believe there was
any evidence of a mucous plug, although he had not been provided with a hospital note
by a U.C. Davis medical resident the day after the event noting "susp mucous plug" as a
cause. He noted that while morphine (which was being administered to Farhan) could
cause respiratory arrest, there was no indication of an excessive dose.  Dr. Ryan did not
believe that the injuries Farhan suffered on May 5, 2006 caused the cardiac arrest.

> Dr. Steven Karch, an expert in cardiac pathology, also testified for the defense.
Dr. Karch believed the cause of death was undetermined, but was definitely not a heart
attack, as the EKGs had been normal and there was no evidence of stressors.  In his
opinion, a mucous plug was unlikely to have been the cause because a person deprived of
oxygen in this manner is apt to thrash around trying to breathe, and there is no evidence
that this occurred.  Dr. Karch acknowledged that Farhan's hands had been tied to the bed
to prevent him from pulling out the tracheostomy tube.  Farhan suffered from an enlarged
heart, which can cause sudden cardiac arrest and death.

*People v. Ray*, Nos. A127613, A127690, 2011 WL 3930322, *1-5 (Cal. Ct. App. Sept. 8, 2011).

On November 10, 2009 a jury found Ray, Moyer, and Morgan guilty of murder.  The jury

found true as to all three defendants the burglary special circumstance allegation and also found

true as to Ray and Morgan the robbery special circumstance.  On February 3, 2010, the trial

court sentenced each of the defendants to a term of life imprisonment without possibility of

parole.

Through counsel, Ray appealed his conviction, arguing that: 1) his right to confrontation

was violated by the court's admission of Morgan's out-of-court statement that Ray was a major

participant and stabbed the homicide victim; 2) the trial court erred in instructing on proximate

cause because it failed to instruct on supervening or intervening cause; 3) the trial court erred by

failing to answer the jury's question about the term "acted with reckless indifference to human

life" and denied Ray the right to counsel when it answered the jury's question off the record and

without the presence of counsel; and 4) the prosecutor committed misconduct by misstating the

burden of proof.  On September 8, 2011, the California Court of Appeal affirmed Ray's

conviction in a reasoned, unpublished opinion.  *Ray*, 2011 WL 3930322, at *17.  Again

proceeding through counsel, Ray sought rehearing on his claim that the jury could not possibly

adhere to the court's instruction that it not consider Morgan's out-of-court statement.  The Court

of Appeal summarily denied rehearing on September 28, 2011.  Counsel for Ray then petitioned

for review of that claim in the California Supreme Court and joined in the petitions for review

filed by Morgan and Moyer.  The supreme court denied the petitions without comment on

December 14, 2011.

Ray then filed in the California Supreme Court a *pro se* petition for a writ of habeas

corpus dated December 23, 2012, in which he asserted that he was actually innocent of the crime

and specifically alleged that: 1) his trial counsel was ineffective for failing to investigate an alibi

defense; 2) the evidence was legally insufficient to prove his guilt; and 3) appellate counsel was

ineffective for failing to raise a sufficiency of the evidence claim.  The supreme court also

summarily denied that petition on March 13, 2013.

Ray timely filed a *pro se* Petition for a Writ of Habeas Corpus in the Northern District of

California on January 25, 2013.  Because the state supreme court had not, by that time, decided

his state habeas petition, Ray additionally moved to stay his federal case pending exhaustion of

his state court remedies, which the Northern District granted.  Docket Nos. 2, 6.  After the state

court denied his state habeas petition, the Northern District lifted the stay.  Docket No. 11.

Ray filed an amended petition dated June 27, 2013.  Respondent moved to transfer the

case to the Eastern District of California, which was granted on October 18, 2013.  The case was

subsequently transferred to the undersigned judge on August 5, 2015.  Accordingly, the amended

petition at Docket No. 7 is now before this Court and ready for disposition.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Ray raises two grounds for relief.  First, he

alleges that trial counsel was ineffective for failing to investigate and present an alibi defense.

Second, Ray contends that he is factually innocent because his conviction is unsupported by

legally sufficient evidence.  Ray additionally requests an evidentiary hearing due to "the

cumulation of errors discussed" in the Petition.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

## IV. DISCUSSION

A.	Ineffective Assistance of Trial Counsel—Alibi Defense

Ray first argues that his trial counsel rendered ineffective assistance because he failed to

adequately investigate the merits of Ray's alibi defense.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the

outcome might have been different as a result of a legal error, the defendant has established

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.*

*United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas

petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice

standard is applied and federal courts do not engage in a separate analysis applying the *Brecht*

harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin*

*v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective

assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because the

10

>*Strickland* standard is a general standard, a state court has even more latitude to
>reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Ray must show that defense counsel's representation was not within the range of

competence demanded of attorneys in criminal cases, and there is a reasonable probability that,

but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474

U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner

fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466

U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if

the defendant fails on one).

Under *Strickland*, defense counsel has a "duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466

U.S. at 691.  However, "the duty to investigate and prepare a defense is not limitless: it does not

necessarily require that every conceivable witness be interviewed."  *Hendricks v. Calderon*, 70

F.3d 1032, 1040 (9th Cir. 1995) (citations omitted).  Furthermore, "ineffective assistance claims

based on a duty to investigate must be considered in light of the strength of the government's

case."  *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citation omitted).

In support of his claim, Ray asserts that he could not have been present at the time of the

robbery because he was attending a Cinco de Mayo party with friends in Sacramento.  Ray

contends that his presence at the party could have been conclusively proven because, while at the

party, he had a conversation with his ex-girlfriend, Christina Lee, who had called the residence

from county jail.  Because the jail monitors outgoing calls from inmates, Ray asserts that there

11

would have been evidence to prove that he could not have participated in the robbery.  However, counsel delayed inquiring about the recorded call and, by the time he did, the investigator sent to retrieve the recording was informed that the calls from the relevant time period had been destroyed.

As an initial matter, Ray fails to establish that a recording of the call even existed.  He claims in his Petition that he promptly informed counsel about the call, but counsel did nothing with the information.  The documents Ray attaches in support of his Petition suggests that Ray's investigator first heard about the claim during his July 2007 interview of Lee, and promptly asked jail personnel whether calls from May 5, 2006, had been recorded.  The record does not indicate a response to the investigator's request, but that appears to be when the defense was informed that records from that date no longer existed.  Ray also fails to demonstrate what the recording would have shown.  For example, if the jail kept a call log that showed when and where calls were made, that evidence would simply have established that Lee called and spoke with someone at her residence at some point during the day of the robbery.  Thus, it is simply not conclusive that a record of the phone call would have established that he did not participate in the robbery, and thus he cannot show that trial counsel was deficient in failing to obtain it.

Moreover, Ray's claim ignores the fact that trial counsel presented alibi testimony from five different witnesses, all of whom testified that Ray was at the Lee residence on the day in question.  Likewise, Ray denied that he was at the robbery and testified that he was with the Lee family that day.  Given that the jury heard that testimony and rejected it as not credible, and in light of the overwhelming evidence against him, as discussed below, there is no reasonable probability that the jury would have found in Ray's favor had it heard evidence of a recorded

phone call.  Thus, Ray cannot show that he was prejudiced by counsel's omission either.

Accordingly, Ray is not entitled to relief on his ineffective assistance of counsel claim.

        B.      Actual Innocence/Insufficiency of the Evidence

Ray additionally contends that he is factually innocent because inconsistencies in the

evidence demonstrate that the evidence was legally insufficient to support his conviction.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the

original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This

Court must therefore determine whether the California court unreasonably applied *Jackson*.  In

making this determination, this Court may not usurp the role of the finder of fact by considering

how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical

facts that supports conflicting inferences," this Court "must presume–even if it does not

affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the

prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system

is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.  *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4.  Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Ray argues that certain evidence presented at trial creates too much doubt to sustain his conviction.  For example, he points to the fact that the bloody black pants found in his apartment

were larger than those he was wearing at the time of the trial.  He additionally notes that one of

the eyewitnesses testified that she saw a blond man walk near the scene of the crime before the

robbery, and Ray has brown, "salt and pepper" hair.  He likewise contends that insufficient

evidence established that his car was at the scene of the crime.  He further argues that it was

evident that Harrison lied when she testified that Ray told her that he had obtained a gun for the

robbery because no evidence showed a gun had been taken, and that Alsop provided false

testimony to obtain a more favorable sentence for Moyer.

But Ray's arguments simply point out inconsistencies in the evidence before the jury and

attack the credibility of the prosecution witnesses.  This Court is precluded, however, from either

re-weighing the evidence or assessing the credibility of witnesses.  *Schlup v. Delo*, 513 U.S 298,

330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).  All of the evidence and

testimony he identifies in support of his claim was before the jury for its assessment.  Although it

might have been possible to draw a different inference from the totality of the evidence, this

Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at

326.  Here, a reasonable juror could have determined, based on the positive eyewitness and other

testimony, the suspicious items found in Ray's car, the identification of his car as being used in

the robbery, and the victim's blood on pants and stolen jewelry found in Ray's residence, that

Ray participated in the robbery that led to the victim's death.  Viewing that evidence in the light

most favorable to the verdict, the record does not compel the conclusion that no rational trier of

fact could have found proof of Ray's participation.  Thus, considering the deference owed under

*Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence

introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt

that Ray was guilty of first degree murder on a felony murder theory.

For the same reasons, to the extent that Ray's claim may be construed to raise a

freestanding claim of actual innocence, such claim must fail.  The Ninth Circuit has not

"resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus

proceeding in the non-capital context." *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014).

However, in a case issued after Respondent filed his Answer, the Ninth Circuit expressly noted

that it "assumed that such a claim is viable." *Id.* (citations omitted).  This Court therefore

assumes that a freestanding actual innocence claim is cognizable on federal habeas review.

Although the Ninth Circuit has not "articulated the precise" standard to establish a

"freestanding actual innocence claim," *id.* at 1247, it has called the standard "extraordinarily

high," *id.* at 1246 (citations and internal quotation marks omitted).  "[A]t a minimum, the

petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that

he is probably innocent." *Id.* (citations and internal quotation marks omitted).  Indeed, both the

Supreme Court and the Ninth Circuit have rejected freestanding actual innocence claims in the

face of compelling new evidence where the new evidence did not "'conclusive[ly] exonerat[e]'"

the petitioner or "'preclude any possibility of [the petitioner's] guilt.'" *Id.* at 1247-48 (quoting

*House v. Bell*, 547 U.S. 518, 555 (2006) and *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir.

1997)).

As previously discussed, Ray simply points potential weaknesses in the prosecution's

case and conflicting evidence, which is grossly insufficient to establish that he is actually

innocent of the crime.  Rather, considering "all the evidence, old and new, incriminating and

16

exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *Jones*, 763 F.3d at 1247, this Court concludes that the total record does not satisfy the "extraordinarily high" standard for establishing actual innocence either, *id.* at 1246.

        C.        Evidentiary Hearing/Cumulative Error

Ray further argues that "the cumulation of errors discussed in this Petition require an evidentiary hearing to determine the prejudice caused to petitioner's right to a fair and impartial trial." Pet. at 34.

To the extent that Ray's request may be viewed as a claim that cumulative error warrants the reversal of his conviction, Ray cannot prevail on such claim. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294. As discussed above, however, Ray does not allege any claims that amount to error, and thus he demonstrates no errors that can accumulate to a level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Moreover, Ray cannot show that he is entitled to an evidentiary hearing.  A district court

may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual

basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of

constitutional law that the Supreme Court has made retroactive to cases on collateral review, or

(b) a factual predicate that could not have been previously discovered through the exercise of

due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and

convincing evidence that, but for constitutional error, no reasonable fact finder would have

found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).  Where the failure

to develop the factual basis for the claim in the state court proceedings is not attributable to the

petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief

and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v.*

*Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that

a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1)

the merits of the factual dispute were not resolved in the state hearing; (2) the state factual

determination is not fairly supported by the record as a whole; (3) the fact-finding procedure

employed by the state court was not adequate to afford a full and fair hearing; (4) there is a

substantial allegation of newly discovered evidence; (5) the material facts were not adequately

developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did

not afford the habeas applicant a full and fair fact hearing.  *Id.* at 670 (quoting *Townsend*, 372

U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Ray has failed to assert a colorable claim for relief as to any of his

claims.  Because Ray does not cite to new laws or underlying facts that were not developed on

the record before the state courts with respect to those claims, he has failed to satisfy his burden

of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Ray's request for an evidentiary hearing

must also be denied.

## V. CONCLUSION AND ORDER

Ray is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Ray's request for an evidentiary hearing is

**DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 26, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge